UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
RINAH J. MESSIER,

Plaintiff,

-against-

AIG CONSUMER FINANCE GROUP, INC.,

Defendant.
----------------------------------------------------------------X

Civil Action No. 05-5242
(Berman, J.)

**COMPLAINT AND JURY TRIAL DEMAND**

Plaintiff Rinah Messier ("Messier"), by her attorneys, Filippatos Risk LLP, hereby alleges as follows:

1. This is an action for employment discrimination on the basis of gender brought against Defendant AIG Consumer Finance Group, Inc. ("AIG") under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. 2000e et seq., the New York State Human Rights Law, New York Executive Law §§ 290 *et seq*, and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 *et seq*. Messier has brought this action because AIG discriminated against her on the basis of her gender by denying her opportunities for promotion, pay raises and benefits, marginalizing her by reducing her duties and excluding her from business activities within her field and job responsibilities, and ultimately by terminating her employment after she had complained about such unlawful treatment within AIG and filed charges alleging gender discrimination and retaliation with the U.S. Equal Employment Opportunity Commission.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this action under 42 U.S.C.200e-5(f), 28 U.S.C.

§§ 1331 and 1343(4) and the supplemental jurisdiction of the Court under 28 U.S.C. § 1367.

3. Venue is proper in this court under 28 U.S.C. §1391(b), as AIG resides in this district and a substantial part of the events giving rise to the claim occurred in this district.

4. Messier filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and brings this action within 90 days of the receipt of a Notice of Right to Sue, mailed by the EEOC on March 4, 2005.

5. Simultaneously with the filing of this Complaint, Plaintiff has mailed a copy of it, along with a letter of explanation, to the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

**JURY TRIAL DEMAND**

6. Under Rule 38(b) of the Federal Rules of Civil Procedure, Messier demands a jury trial on all issues triable as of right by a jury

**THE PARTIES**

7. Messier is a female American citizen residing in Manhattan, New York.

8. On information and belief, AIG is a New York corporation with its principal offices at 70 Pine Street, 11th floor, New York, New York 10270, and an employer within the meaning of 42 U.S.C. 2000e-(b), and the New York State and New York City Human Rights Laws.

**FACTS SUPPORTING THE ALLEGATIONS**

9. AIG was established in 1995, and owns and manages a number of consumer lending businesses and banks located around the world. It is a wholly owned subsidiary of American International Group, Inc., a major insurance and financial services firm.

10. Messier joined AIG in 1996 as Vice President, Global Credit Policy Manager, working in its New York office. She was employed there continuously until AIG terminated her in December, 2003.

11. Messier's background and credentials compared favorably to those of her male co-workers. She has a M.S. in Management from Massachusetts Institute of Technology. Her expertise is in consumer lending policy, lending, loan servicing and collections operations. Prior to joining AIG, she worked for 8 years at Citicorp Mortgage, Inc. as a Vice President and Credit Officer.

12. Messier's primary job function was to establish global credit policies and oversee their implementation throughout AIG's various consumer lending businesses.

13. Between 1996 and 2001, Messier worked for 4 different supervisors at AIG and consistently had good performance appraisals.

14. Among her duties was the drafting of AIG's Global Credit Policy Manual.

15. The Global Credit Policy Manual set requirements and standards as to how AIG executives and subsidiary companies should prudently manage credit risk, monitor AIG's exposure for the various loan products in its portfolio, and monitor loan performance.

16. Despite her recognized good performance, Messier received no promotions during her tenure at AIG, though men were promoted.

17. Messier received no salary increases after 2000, though male co-workers did.

18. Messier received no bonus compensation after 2001, though male co-workers did.

19. The denial to Messier of opportunities to increase her income and develop her career was an experience common to almost all women who worked at AIG during Messier's tenure.

20. Of approximately 38 professional employees working at the Company as of Messier's termination in 2003, only about six were women.

21. Between 1995 and October, 2003, men were hired to fill senior professional staff positions by a 4 to 1 margin over women.

22. Of the 28 hires for senior professional positions between 1999 and October 2003, 26 were men.

23. A steady march of women left AIG or were forced to leave during Messier's tenure there. As of her termination, Messier had been employed at AIG longer than any other woman in a management position in the history of AIG.

24. These problems are caused in part by the bias in the Company's hiring practices in favor of persons already known to senior management, many of whom were former colleagues of the Chief Executive Officer, Joel Epstein ("Epstein"), in his previous career at JP Morgan Chase, and almost always were white males. Most positions at AIG are filled quietly in this manner and are not even posted within American International Group, Inc.

25. AIG employees referred to these employees as "FOJ," for "Friends of Joel [Epstein]", and "SOFOJ", for "Sons of Friends of Joel [Epstein]".

26. In 2000, Messier's supervisor left the Company and she reported directly to Epstein for a period of several months.

27. Epstein praised Messier and her contribution to AIG.

28. In December 2000, Epstein gave Messier a raise and bonus, and increased her vacation from three to four weeks per year, so that it was equal to what her male peers already received.

29. Male employees hired at the time Messier was hired had received four weeks

vacation beginning from their date of hire.

30. Messier told Epstein that she thought she was underpaid, and he told her that he would be able to increase her compensation further during the next year, to $150,000 plus a $25,000 bonus, a substantial increase in Messier's compensation.

31. Epstein also told Messier that he would attempt to get her admitted into "Star International Company" ("SICO"), a company owned by an inner circle of executives and managers of American International Group, Inc.

32. On information and belief, SICO's principal function is to serve as a vehicle for the payment of long term compensation for a select group of officers of American International Group, Inc. and its subsidiaries, almost all of whom are men.

33. In early 2001, Michele Lagoutte, a former colleague of Epstein at JP Morgan Chase, was hired and joined the Company as Chief Credit Officer, becoming Messier's direct supervisor.

34. From Messier's first meeting with Lagoutte it was clear to her that Lagoutte was uncomfortable with her because of her gender, and he proceeded to treat her in a discriminatory fashion throughout his supervision of her.

35. After only two months supervising Messier's work, Lagoutte gave Messier a terrible performance review, the worst she had ever received in her career.

36. The review covered a one year period, though Lagoutte had not worked with her or supervised her, or even been employed at AIG, for the vast majority of that period.

37. Lagoutte acknowledged to Messier that in preparing her review, he had not made any attempt to speak with the other senior managers in AIG who had actual knowledge of her work during the period under review.

38. At the end of 2001, when Lagoutte awarded Messier her annual bonus, he told her that she did not deserve it, and that the only reason she was receiving it was that it had been budgeted before he had joined AIG.

39. Though AIG continued to pay bonuses to her male co-workers, Messier never received a bonus again.

40. From the beginning of their relationship, Lagoutte attempted to steadily marginalize Messier and her work, removing her professional responsibilities and leaving her with duties that were more appropriate for a secretary.

41. He excluded Messier from business meetings about strategy, policy, acquisitions and other matters that were within her job function and that she had always been involved in the past.

42. At the same time, however, Lagoutte criticized Messier for not being "engaged" in her work.

43. After five successful years at AIG, Messier's responsibilities and opportunities were suddenly truncated, and her career began to resemble that of many of the other women professionals who had passed through AIG.

44. In 2002, Lagoutte gave Messier another poor performance appraisal. When she wrote a reply attempting to correct factual errors in the review, he told her that was "a symptom of your problem".

45. During the period that Lagoutte was marginalizing Messier, he unilaterally rescinded AIG's Global Credit Policy Manual, which Messier had written, because he concluded that many of AIG's lending activities were not in compliance with it.

46. Rather than require the various businesses to comply with the Global Credit

Policy Manual, Lagoutte simply replaced it with a Credit Policy Guide containing much weaker standards and guidelines.

47. On information and belief, Lagoutte made these changes to protect AIG from findings by internal or external auditors and/or banking regulators that AIG's businesses were not in compliance with its own written credit policies.

48. Lagoutte's rescinding of the Global Credit Policy Manual and weakening the company's standards, however, increased AIG's exposure to potential fraud and losses from bad loans.

49. Messier feared that if she attempted to report Lagoutte's unfair and discriminatory treatment of her to senior management or to AIG Human Resources, given the male dominated culture within AIG it would jeopardize her career at AIG.

50. In August 2003, Lagoutte gave Messier yet another unfair and discriminatory performance review.

51. Notably, Lagoutte gave Messier no points for "due diligence activities", which had been an acknowledged major strength of hers during her time at AIG.

52. Though the form for the employee review is an AIG standard form, Lagoutte left completely blank that part of the form that was intended to give Messier her future goals and objectives.

53. On August 27, 2003, fearing that Lagoutte was determined to end her career at AIG, Messier went to Epstein to complain about the discriminatory performance review given by Lagoutte.

54. Epstein told Messier that he was aware that Lagoutte had problems working with her, and that he had heard things about her from Lagoutte that he could not reconcile with his

own positive experience working with her.

55. Epstein volunteered to Messier that he valued her as an employee, in particular her knowledge of and operations experience in lending practices and policies.

56. Epstein told Messier that he would speak to other AIG officials about moving Messier to another position.

57. Messier felt relieved, pleased, and extremely appreciative that Epstein had volunteered to move to her another position in which she could productively contribute to AIG.

58. Two days later, on August 29, 2003, Kerry McDonnell, Vice President of Human Resources met with Messier and acknowledged to her that Lagoutte had not given her proper recognition and had "demotivated" her.

59. McDonnell told Messier that she could not have been expected to perform well under the circumstances, and that she would be "given a new opportunity to wipe the slate clean", and "get a fresh start".

60. Messier was immediately relieved of her duties and assigned to a new supervisor, Allen Hackney, to do a "special project", a study on the Company's collection policy and processes.

61. Lagoutte instructed Messier to transfer her work to Travis White, a 25 year old male research analyst, who was the son of a friend Epstein's from JP Morgan Chase.

62. Messier reported to Hackney, who immediately told her that he had did not have an open position for her, meaning that there could be no permanent position for her.

63. Messier was told that there was no position budgeted for her after the completion of the special project, but that as part of the special project she could recommend that AIG create a permanent position of "collections manager", and then lobby senior management for her to be a

candidate for such position.

64. Messier now realized that her meeting with Epstein to protest her treatment by Lagoutte could result in her termination.

65. In October, 2003, Messier filed a charge of discrimination with the EEOC, alleging gender discrimination and retaliation in connection with the above events.

66. When AIG learned about the EEOC charge, McDonnell came to Messier's office in an agitated state, closed the door behind him, and in a raised voice told her that he was personally offended that she had filed it, after all that he was doing to try to help her.

67. In November 2003, when the "special project" was completed, AIG terminated Messier's employment, based on her gender, and in retaliation for her complaint about discriminatory treatment to AIG, and the filing of her charge with the EEOC.

68. Messier left AIG at the end of 2003.

**First Cause of Action**

**(Gender Discrimination under Civil Rights Act of 1964)**

68. Messier repeats and realleges the allegations set forth in paragraphs 1 through 68 above.

69. In her seven years as Vice President, Credit Policy Manager, Messier performed her job capably, but because of her gender was denied promotions, pay increases, bonus compensation, pension accrual, admission in SICO, and other economic and professional benefits because of her gender, while men of lesser or equivalent qualifications received such benefits.

70. Though she was fully able to perform with excellence the requirements of her job, and had been recognized as having done so, Lagoutte set about to marginalize Messier and then

to terminate Messier's employment because of her gender, which plan was carried out fully.

71. AIG's conduct was in violation of Messier's rights under the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

72. As a proximate result of AIG's acts of discrimination against her, Messier has suffered and continues to suffer substantial economic losses, including past and future earnings, and other employment benefits.

73. As a further proximate result of AIG's unlawful actions, Messier has suffered and continues to suffer damage to her reputation, embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

74. AIG's conduct was outrageous and malicious, was specifically intended to injure Messier, and was done with reckless indifference to Messier's protected civil rights, entitling Messier to an award of punitive damages.

**Second Cause of Action**

**(Gender Discrimination under New York State Human Rights Law)**

75. Ms. Messier repeats and realleges the allegations set forth in paragraphs 1 through 74 above.

76. AIG's disparate treatment of Messier, based on her gender, including the termination of her employment, was in violation of the New York State Human Rights Law.

77. As a result of AIG's unlawful conduct, Messier has been denied employment, has suffered economic injury, including lost wages, benefits, pension accrual, admission into SICO, bonuses and promotional opportunities.

78. As a direct and proximate consequence of Defendants' intentional, unlawful, and discriminatory treatment of Ms. Messier, she has suffered and continues to suffer damage to her

reputation, humiliation, mental anguish, emotional distress and loss of enjoyment of life; and has incurred damages thereby.

**Third Cause of Action**

**(Gender Discrimination under New York City Human Rights Law)**

79. Ms. Messier repeats and realleges the allegations set forth in paragraphs 1 through 78 above.

80. AIG's disparate treatment of Messier, based on her gender, including the termination of her employment, was in violation of the New York City Human Rights Law.

81. As a result of AIG's unlawful conduct, Messier has been denied employment, has suffered and continues to suffer monetary damages including, but not limited to, a loss of income, including wages, bonuses, promotions, pension accrual, admission into SICO, and other company-sponsored benefits.

82. As a direct and proximate consequence of Defendants' intentional, unlawful, and discriminatory treatment of Messier, she has suffered and continues to suffer damage to her reputation, humiliation, mental anguish, emotional distress and loss of enjoyment of life; and has incurred damages thereby.

83. AIG's conduct was outrageous and malicious, was intended to injure Messier, and was done with reckless indifference to Messier's protected civil rights, entitling Messier to an award of punitive damages.

**Fourth Cause of Action**

**(Unlawful Retaliation under Civil Rights Act of 1964)**

84. Messier repeats and realleges the allegations set forth in paragraphs 1 through 83 above.

85. AIG terminated Messier in retaliation for her complaint to Epstein about Lagoutte's unlawful treatment of her, and her filing of a charge of discrimination with the EEOC, in violation of her rights under the Civil Rights Act of 1964.

86. As a proximate result of AIG's retaliation against her, Messier has been denied employment, has suffered and continues to suffer monetary damages including, but not limited to, a loss of wages, bonuses, promotions, pension accrual, admission into SICO, and other company-sponsored benefits.

87. As a further proximate result of AIG's actions, Messier has suffered and continues to suffer damage to her reputation, lasting embarrassment, humiliation and anguish, and other incidental damages and expenses.

88. AIG's conduct was outrageous, was done in a deliberate, callous, malicious and oppressive manner intended to injure Messier, in conscious disregrard of Messier's rights, entitling Messier to an award of punitive damages.

**Fifth Cause of Action**

**(Unlawful Retaliation under New York State Human Rights Law)**

90. Messier repeats and realleges the allegations set forth in paragraphs 1 through 88 above.

91. AIG terminated Messier in retaliation for her complaint to Epstein about Lagoutte's unlawful treatment of her, and her filing of a charge of discrimination with the EEOC, in violation of the New York State Human Rights Law.

92. As a proximate result of AIG's retaliation against her, Messier has suffered and continues to suffer monetary damages including, but not limited to, lost wages, bonuses, promotions, pension accrual, admission into SICO, and other company-sponsored benefits.

93. As a further proximate result of AIG's actions, Messier has suffered and continues to suffer damage to her reputation, lasting embarrassment, humiliation and anguish, and other incidental damages and expenses.

94. AIG's conduct was outrageous, was done in a deliberate, callous, malicious and oppressive manner intended to injure Messier, in conscious disregrard of Messier's rights, entitling Messier to an award of punitive damages.

**Sixth Cause of Action**

**(Unlawful Retaliation under New York City Human Rights Law)**

95. Messier repeats and realleges the allegations set forth in paragraphs 1 through 94 above.

96. AIG terminated Messier in retaliation for her complaint to Epstein about Lagoutte's unlawful treatment of her, and her filing of a charge of discrimination with the EEOC, in violation of her rights under the New York City Human Rights Law.

97. As a proximate result of AIG's retaliation against her, Messier has suffered and continues to suffer substantial losses, including past and future earnings, lost wages, bonuses, promotions, pension accruals, admission into SICO, and other employment benefits.

98. As a further proximate result of AIG's actions, Messier has suffered and continues to suffer damage to her reputation, lasting embarrassment, humiliation and anguish, and other incidental damages and expenses, incurring damages thereby.

99. AIG's conduct was outrageous, was done in a deliberate, callous, malicious and oppressive manner intended to injure Messier, in conscious disregrard of Messier's rights, entitling Messier to an award of punitive damages.

**WHEREFORE,** Plaintiff Rinah Messier respectfully requests that the Court grant

judgment as follows:

A. On the First Cause of Action, i) ordering that AIG restore Messier to her former position with full seniority, status, salary increments, bonuses and benefits, to the extent that she would have received them but for AIG's unlawful conduct; ii) ordering that AIG is prohibited from continuing or maintaining the policies and practices of denying job benefits and promotions to employees on the basis of gender; iii) awarding Messier her actual damages in an amount to be determined at trial for loss of wages, benefits, and promotion opportunities, including an award of front pay for loss of future salary and benefits, iv) awarding to Messier of compensatory damages for humiliation, mental anguish and emotional distress sustained by her to the fullest extent permitted by law; v) awarding to Messier punitive damages in an amount sufficient to punish and deter AIG's unlawful employment practices in the future, in an amount not less than $1,000,000; and vi) awarding reimbursement of Messier's costs incurred in this action, together with her reasonable attorneys fees to the fullest extent permitted by law;

B. On the Second Cause of Action, i) ordering that AIG restore Messier to her former position with full seniority, status, salary increments, bonuses and benefits, to the extent that she would have received them but for AIG's unlawful conduct; ii) ordering that AIG is prohibited from continuing or maintaining the policies and practices of denying job benefits and promotions to employees on the basis of gender; iii) awarding Messier her actual damages in an amount to be determined at trial for loss of wages, benefits, and promotion opportunities, including an award of front pay for loss of future salary and benefits, iv) awarding Messier compensatory damages not less than $1,000,000 for humiliation, mental anguish and emotional distress sustained by her; and v) awarding reimbursement of Messier's costs incurred in this action, together with her reasonable attorneys fees to the fullest extent permitted by law.

C. On the Third Cause of Action, i) ordering that AIG restore Messier to her former position with full seniority, status, salary increments, bonuses and benefits, to the extent that she would have received them but for AIG's unlawful conduct; ii) ordering that AIG is prohibited from continuing or maintaining the policies and practices of denying job benefits and promotions to employees on the basis of gender; iii) awarding Messier her actual damages in an amount to be determined at trial for loss of wages, benefits, and promotion opportunities, including an award of front pay for loss of future salary and benefits, iv) awarding to Messier of compensatory damages for humiliation, mental anguish and emotional distress sustained by her, in an amount not less than $1,000,000; v) awarding to Messier punitive damages in an amount sufficient to punish AIG for its malicious conduct and deter AIG's outrageous and unlawful employment practices in the future, not less than $1,000,000; and vi) awarding reimbursement of Messier's costs incurred in this action, together with her reasonable attorneys fees to the fullest extent permitted by law;

D. On the Fourth Cause of Action, i) ordering that AIG restore Messier to her former position with full seniority, status, salary increments, bonuses and benefits, to the extent that she would have received them but for AIG's unlawful retaliation against her; ii) ordering that AIG is prohibited from continuing or maintaining the policies and practices of retaliating against employees who raise charges of discrimination on the basis of gender; iii) awarding Messier her actual damages in an amount to be determined at trial for loss of wages, benefits, and promotion opportunities, including an award of front pay for loss of future salary and benefits, iv) awarding to Messier of compensatory damages not less than $1,000,000 for humiliation, mental anguish and emotional distress sustained by her; v) awarding to Messier punitive damages in an amount sufficient to punish and deter AIG's unlawful employment practices in the future, not less than

$1,000,000; and vi) awarding reimbursement of Messier's costs incurred in this action, together with her reasonable attorneys fees to the fullest extent permitted by law;

E. On the Fifth Cause of Action, i) ordering that AIG restore Messier to her former position with full seniority, status, salary increments, bonuses and benefits, to the extent that she would have received them but for AIG's unlawful retaliation against her; ii) ordering that AIG is prohibited from continuing or maintaining the policies and practices of retaliating against employees who raise charges of discrimination on the basis of gender; iii) awarding Messier her actual damages in an amount to be determined at trial for loss of wages, benefits, and promotion opportunities, including an award of front pay for loss of future salary and benefits, iv) awarding to Messier of compensatory damages not less than $1,000,000 for humiliation, mental anguish and emotional distress sustained by her; and v) awarding reimbursement of Messier's costs incurred in this action, together with her reasonable attorneys fees to the fullest extent permitted by law;

F. On the Sixth Cause of Action, i) ordering that AIG restore Messier to her former position with full seniority, status, salary increments, bonuses and benefits, to the extent that she would have received them but for AIG's unlawful retaliation against her; ii) ordering that AIG is prohibited from continuing or maintaining the policies and practices of retaliating against employees who raise charges of discrimination on the basis of gender; iii) awarding Messier her actual damages in an amount to be determined at trial for loss of wages, benefits, and promotion opportunities, including an award of front pay for loss of future salary and benefits, iv) awarding to Messier of compensatory damages not less than $1,000,000 for humiliation, mental anguish and emotional distress sustained by her; v) awarding to Messier punitive damages in an amount sufficient to punish and deter AIG's unlawful employment practices in the future, not less than

$1,000,000; and vi) awarding reimbursement of Messier's costs incurred in this action, together with her reasonable attorneys fees to the fullest extent permitted by law;

G. Granting costs, attorneys fees, and such other or additional relief as this Court deems just and proper.

.

Dated: New York, New York
June 2, 2005

Respectfully submitted,

FILIPPATOS RISK LLP

By:________________________
Mark D. Risk (mdr 5823)

Attorneys for Plaintiff
60 East 42nd Street, 47th Floor
New York, NY 10165
(212) 682-2400